**PAUL N. HOWARD COMPANY,**
Plaintiff, Appellee,

v.

**PUERTO RICO AQUEDUCT SEWER
AUTHORITY, Defendant, Appellant,**

v.

**INSURANCE COMPANY OF NORTH
AMERICA, Third-Party
Defendant, Appellee.**

No. 83–1824.

United States Court of Appeals,
First Circuit.

Argued May 10, 1984.

Decided Aug. 29, 1984.

Rehearing Denied Oct. 11, 1984.

Paul A. Lenzini, Washington, D.C., with whom Luis Guinot, Jr., William A. Hutchins, Washington, D.C., Hernando A. Rivera and Chapman, Duff & Paul, Hato Rey, P.R., were on brief, for defendant, appellant.

Steven C. Lausell, Hato Rey, P.R., with whom Jimenez & Fuste, Hato Rey, P.R., was on brief, for appellees.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

This dispute arises out of an unsuccessful attempt to lay a 66-inch diameter concrete sewer pipe along a route almost two miles long in Mayaguez, Puerto Rico. The plaintiff, Paul N. Howard Company ("How-

ard"), was hired by the defendant, the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), to construct the pipeline. Howard claims that due to an unexpected site condition it was impossible to build the sewer in compliance with contract specifications. Howard brought this suit seeking partial rescission of the contract and compensation for extra costs incurred as a result of design changes ordered by PRASA after construction began.

The district court for the District of Puerto Rico entered a judgment in favor of Howard in the amount of about $4 million. The district court also awarded Howard attorney's fees "in view of the temerity and obstinacy displayed by [the] defendant".

PRASA appeals, arguing that the district court erred in holding that the terrain at the foot of the embankment of P.R. Highway No. 2 constituted a differing site condition and in holding that it was impossible to lay the sewer along the straight line specified in the contract. PRASA also challenges the district court's award of costs incurred by Howard as a result of PRASA's decision to increase the required load capacity of the sewer's supporting piles and argues that the district court abused its authority in awarding attorney's fees. Finally, PRASA argues that as an instrumentality of the government of Puerto Rico it is immune from a suit for damages in federal court under the Eleventh Amendment. We reject each of these claims and affirm the judgment of the district court.

### Differing Site Condition

The original contract called for Howard to lay the sewer line parallel to P.R. Highway No. 2 for a distance of over 500 meters. Howard was expected to dig a ditch about forty feet deep at the toe of the highway embankment, drive piles to support the pipeline, place the pipeline on top of the piles at the bottom of the ditch, and

then backfill the ditch with earth, burying the pipeline. It was Howard's obligation under the contract to design and use a sheet piling system which would support the wall of the excavation during construction. Howard did design and use such a system, but shortly after Howard began excavation at the toe of the highway embankment it settled, pushing the sheet piling system into the excavation and causing the highway itself to settle. Howard then backfilled the trench to prevent further damage to the highway, and notified PRASA that it had encountered a "differing site condition" [1], requiring modification of the contract terms. PRASA ordered Howard to further backfill the excavation to an elevation higher than the surrounding ground level, but disputed Howard's claim that the tendency of the highway embankment to slide constituted a differing site condition.

Both parties retained soil experts to investigate the cause of the settlement of the highway embankment. In their discussions PRASA insisted that the settlement was caused by Howard's use of an inadequate sheet piling system, while Howard argued that given the structure of the highway embankment and the nature of the soil conditions at the site, it would be impossible to lay the pipeline as planned without causing some settlement of the highway and displacement of the pipeline.

After an impasse of more than four months, PRASA and Howard agreed that Howard would make another attempt to lay the pipeline along the highway. This time Howard limited its excavation, removing only enough earth to allow it to install one section of pipe at a time. Howard's soil consultant was at the site and directed a significant portion of this second excavation. Between February 18, 1980 and March 3, 1980, Howard installed nine sections of pipe without experiencing any lateral displacement. Highway settlement

---

1. The contract between Howard and PRASA incorporated the standard definition of differing site conditions defining them, in part, as "unknown physical conditions at the site, of an

unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract".

was limited to a maximum of 4⅛" during that period. But after the sheet piling was removed, as required by the contract, the highway settled 15" and the pipeline was displaced laterally. At the time the parties believed that the pipeline was 14" off center. More recent measurements indicate that the lateral displacement did not exceed 7".

PRASA did not consider this deviation from the design specifications acceptable and refused to approve or pay for Howard's work in this area of the project. Howard abandoned the construction site in December, 1980 after having spent more than five months in an unsuccessful attempt to obtain a change order from PRASA. This lawsuit followed.

The district court held in Howard's favor, concluding that it was not possible for Howard to construct the pipeline along the route designated by PRASA in the manner specified in the contract without causing settlement of the highway embankment and displacement of the pipeline. The district court found that the instability of the highway embankment constituted a differing site condition justifying rescission of that part of the contract that required Howard to lay the pipeline along the highway embankment and rejected PRASA's contention that it was the design of Howard's sheet piling system that was responsible for Howard's difficulties. In coming to this conclusion, the district court relied on expert testimony that the tendency of the highway embankment to slide was unusual and unpredictable, and that only by changing the course of the pipeline or leaving the sheet piling in place could lateral displacement of the pipeline be prevented. The court also relied on testimony describing the difficulties another construction company encountered when it attempted to lay this section of the pipeline several years after Howard had abandoned its attempt.

■ On appeal PRASA attacks the district court's conclusion that the conditions encountered by Howard were unusual and unpredictable and that construction of the pipeline according to the design plans was impossible. After reviewing the record, we

reject PRASA's contentions. It is not our task to reweigh the evidence presented to the district court. We may alter that court's judgment only if it applied an erroneous legal standard or committed a clear error in its findings of fact. We have not been referred to, nor have we found, any evidence indicating that the district court made either of these errors.

■ As noted by the trial judge in his findings of fact, there was expert testimony to the effect that the instability of the highway embankment was unusual and unexpected:

"It is my opinion that the designers of this project did not anticipate the events which we have observed. And I do not mean that to be critical because I do not think they should be severely faulted for that. The condition which we find is not common. I do not think that the contractor anticipated the occurrences which we observed. I do not think that the soil consultant anticipated the conditions which we observed. In short, I don't [think] anybody anticipated what we have observed.

"[I]n October of 1979, we all suddenly learned a lesson." Testimony of Sydney M. Johnson, VI Joint Appendix 1736–37. Given this and other testimony describing the uncommon instability of the highway embankment, we believe that the requisite elements of a differing site claim were established. *See William A. Smith Contracting Company v. United States,* 188 Ct.Cl. 1062, 412 F.2d 1325, 1338 (1969) ("[A] changed condition is encountered when the condition could not have been reasonably anticipated from an examination of the site or from a study of the contract drawings and specifications.").

■ We must also reject PRASA's claim that it was Howard's sheet piling system, rather than the nature of the embankment, that caused the construction difficulties. Although there was testimony indicating that different sheet piling systems might have prevented the highway from settling and the pipeline from shifting, other experts indicated that these other systems would have been impractical or ineffective

and that only changing the route of the pipeline or leaving the sheet piling in place could ensure the success of the project. Under these circumstances we have no hesitation in affirming the district court's conclusion that Howard's sheet piling system was not the cause of the settling and shifting.

■ Finally, we reject PRASA's contention that the district court improperly based its finding of impossibility on an "insignificant defect"—the 7″ lateral deviation in the pipeline. Inasmuch as PRASA refused to accept the pipeline with that deviation, and inasmuch as PRASA ordered Howard not to proceed unless it could prevent the embankment from sliding, we think the district court was justified in concluding that it was impossible to lay the pipeline within the tolerances deemed acceptable by PRASA.

Accordingly, we find no error in the district court's award of costs incurred by Howard as a result of the differing site condition encountered.

### Change in Pile Capacity

The second group of claims raised in this appeal challenge the district court's award to Howard of the extra costs it incurred as a result of PRASA's instruction that some of the piles used to support the pipeline be a higher "ultimate capacity" [2] than was required by the original contract. PRASA argues that Howard should not have been allowed to recover its increased costs because there was a patent ambiguity in the contract documents that should have put Howard on notice that an ultimate capacity of more than 100 tons might be required. PRASA also contends that the district court erred in allowing Howard to recover extra costs incurred due to its inability to use a "follower" [3] to drive the higher capacity piles, and in calculating the amount Howard is entitled to recover.

**2.** The term "ultimate capacity" refers to the greatest weight a pile will support without failing.

**3.** A "follower" acts as an extension of the top of the pile and permits the pile to be driven below the surface of the ground. Howard intended to use a follower to drive the pipeline's supporting piles before beginning excavation. That tech-

[5] We have carefully reviewed PRASA's claims, but we decline to disturb the district court's award. There is a wealth of evidence in the record to support the court's finding that PRASA raised the required ultimate capacity of some of the piles from 100 tons to 135 tons after the contract was signed. PRASA's argument that the contract documents were ambiguous appears to have been raised for the first time on appeal and is therefore barred. *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979). Even if it had been argued below, the theory would be of no avail because the district court's conclusion that the contract documents required piles with a 100-ton ultimate capacity is not clearly erroneous.

■ The evidence also supports the court's conclusion that the change to piles of 135 ton ultimate capacity significantly increased Howard's construction costs. Under these circumstances Howard was entitled to an equitable adjustment. The district court did not err in making that calculation. PRASA's delay in notifying Howard of the change in the required pile capacity and its failure to produce design calculations at trial justify the court's conclusion that PRASA breached its contractual obligations to Howard.

PRASA claims that Howard should not be able to recover any extra costs incurred as a result of its inability to use a follower because the contract provided that use of a follower should be avoided. PRASA argues that if Howard submitted its bid in reliance on its use of a follower, it did so at its own risk and thus should be barred from any recovery on this ground. We disagree.

■ The district court properly found that the use of a follower is a customary nique is more efficient and less expensive than driving the piles after the trench has been excavated. But when PRASA increased the required pile capacity to 135 tons, Howard found it impossible to use the follower successfully, because the higher capacity piles were longer and more difficult to drive.

technique, which Howard could reasonably have expected to use with success on this project in driving piles with a 100-ton ultimate capacity. The contract did not absolutely bar use of the follower; it merely required that Howard obtain PRASA's permission before using the technique. Since Howard knew that permission could not be unreasonably withheld, it was entitled to bid in reliance on use of the technique. Indeed, PRASA did agree to use of the follower and substantial evidence at trial indicated that such use would have been successful if PRASA had not subsequently increased the ultimate capacity requirement for some of the piles. On this record we think Howard was entitled to recover the extra costs it incurred due to its inability to use a follower.

Finally, we reject PRASA's claim that the district court improperly calculated the costs recoverable by Howard due to the pile capacity change. PRASA argues that Howard failed to establish the essential prerequisites to a claim for total costs. As the district court noted, in order for Howard to recover all the extra costs it incurred in driving the 135-ton ultimate capacity piles, it had to prove that:

"(1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses." *Moorhead Construction Company, Inc. v. City of Grand Forks,* 508 F.2d 1008, 1016 (8th Cir.1975) (citations omitted).

We agree with the district court that Howard satisfied this standard.

■ PRASA points out that the district court based its finding that Howard's original bid was realistic on the fact that it was accepted. While we agree that the mere fact that a bid was accepted does not demonstrate that it was reasonable, we think the record mandates the conclusion that Howard's bid was not unrealistically low. Specifically, we find persuasive the testimony that Howard's bid was in line with the three other bids PRASA received.

It was slightly higher those that submitted by two of the three unsuccessful bidders and slightly lower that submitted by the third.

Nor do we accept PRASA's contentions that Howard's actual costs were unreasonable and that Howard was responsible for the additional expenses. On the basis of all the evidence the district court concluded that Howard's extra costs were reasonable. As we have noted above, it is not our function to try this case *de novo.* Based upon our review of the parties' briefs and the record, we find no reason to doubt the district court's conclusion.

## Award of Attorney's Fees

Relying on Rule 44.4(d) of the Puerto Rico Rules of Civil Procedure, 32 L.P.R.A. Appendix II, which provides that a court may impose attorney's fees "[w]here a party has been obstinate", the district court awarded Howard attorney's fees on account of PRASA's "temerity and obstinancy".

■ We have previously warned of the dangers of the over-application of this rule and indicated that explicit findings should be made to justify such an award. *Carrillo v. Sameit Westbulk,* 514 F.2d 1214, 1219–21 (1st Cir.1975). In awarding attorney's fees in this case, the district court noted that the defendant had delayed the case and multiplied discovery through its refusal to admit facts that were clearly established and by its tedious cross-examination that proceeded "endlessly without establishing any discernable train of thought nor proving any relevant facts". The court also emphasized that the defendant made "no discernable attempt ... to establish the allegations contained in [its] counterclaim" and that it's witnesses "were in many cases unable or unprepared to give any relevant, credible testimony to either refute the plaintiff's claims or support its own...."

Although we do not lightly endorse an award of fees under Rule 44.4(d) in a complex, hard fought case such as the one before us, we believe that the court's findings, as supplemented by the record, are adequate to support its award of attorney's

fees. We note particularly that the record supports the court's findings and that it contains at least three warnings from three different judges regarding the possibility that sanctions would be imposed if the parties did not cooperate in expediting this litigation.

### Eleventh Amendment

■ PRASA's final argument is that it is immune from suit in federal court under the Eleventh Amendment. This claim is raised for the first time on appeal, but inasmuch as it challenges the jurisdiction of this court, we must consider it. *E.g., Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974). The Eleventh Amendment, which deprives the federal courts of power to hear claims for damages against any of the United States, has been held to apply to Puerto Rico. *Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 776 n. 7 (1st Cir.1981).

We doubt that PRASA is sufficiently an arm of the state to qualify for the protection of the Eleventh Amendment. *See generally,* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3524 (1975) (discussing the factors considered in determining whether the state is the real party in interest in a particular case). An autonomous governmental corporation, such as PRASA, which was established to provide drinking water and sewage facilities for the people of Puerto Rico, *see* 22 L.P.R.A. § 141–68 ("Aqueduct & Sewer Act of Puerto Rico"), is not normally immune from suit in federal court. 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3524, at 87 (1978). PRASA receives periodic appropriations from the state treasury, but it is financially independent of the Commonwealth. It has no power to pledge the credit or taxing power of the Commonwealth and the bonds it issues are its debts alone. PRASA's operations generate substantial revenue, and it does not seriously dispute Howard's assertion that the judgment rendered in this case will be paid out of PRASA's funds, rather than those of the Commonwealth. Taken together these facts might well lead us to conclude that PRASA is not an alter ego of the state and therefore does not qualify for immunity under the Eleventh Amendment. *See, e.g., Miller-Davis Company v. Illinois State Toll Highway Authority,* 567 F.2d 323, 327 (7th Cir.1977).

■ We need not take that step today, however, because we conclude that PRASA has waived any protection it may or may not enjoy under the Eleventh Amendment by its conduct during this litigation. There is no question that a state may waive its Eleventh Amendment immunity, *e.g., Pennhurst State School & Hospital v. Halderman,* — U.S. —, —, 104 S.Ct. 900, 905, 79 L.Ed.2d 67 (1984), and it has long been established that a general appearance may constitute such a waiver, *e.g., Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1883). In the circumstances of this case, where PRASA not only appeared but filed a counterclaim and a third-party complaint, we have little trouble concluding that PRASA voluntarily submitted to the jurisdiction of the federal court, thereby waiving any Eleventh Amendment immunity it might or might not have enjoyed. *See, e.g., Newfield House, Inc. v. Massachusetts Department of Public Welfare,* 651 F.2d 32, 36 n. 3 (1st Cir.1981).

*The judgment of the district court is affirmed. Costs shall be borne by appellant.*

### MEMORANDUM AND ORDER

Having carefully considered the petition of Puerto Rico Aqueduct and Sewer Authority (PRASA) for rehearing, we determine that it should be denied. We perceive no ground for reconsidering our conclusions with respect to the existence of a differing site condition, and we remain equally convinced that PRASA enjoys no Eleventh Amendment immunity.

■ With respect to the latter issue, we note that the Supreme Court of Puerto Rico has in two persuasive opinions reasoned that PRASA, by statute is a public corporation, "a personality separate and apart from that of the government", which statute "depriv[es] it of the protection of

sovereign immunity traditionally enjoyed by the State." *Canchani v. C.R.U.V.*, 105 D.P.R. 352, 356–57 & n. 2 (1976); *A.A.A. v. Union Empleados A.A.A.*, 105 D.P.R. 437, 455–57 (1976). While Eleventh Amendment immunity is a federal question, we deem highly significant for the purpose of determining at least whether a state has waived any immunity to suit in federal court the pronouncements of that state's highest court clearly indicating the propriety of treating PRASA as a seperate entity generally. *Long v, Richardson*, 525 F.2d 74, 79 (6th Cir.1975).

Accordingly, PRASA's petition for rehearing is denied.