**Miguel A. FIGUEROA–RODRIGUEZ, et
al., Plaintiffs, Appellees,**

v.

**Jorge L. AQUINO, etc., et al.,
Defendants, Appellants.**

**No. 87–1512.**

United States Court of Appeals,
First Circuit.

Heard Feb. 1, 1988.
Decided Dec. 9, 1988.

Vannessa Ramirez, Asst. Sol. Gen., with whom Rafael Ortiz Carrion, Sol. Gen., and

Norma Cotti Cruz, Deputy Sol. Gen., were on brief for defendants, appellants.

A.J. Amadeo Murga for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

The plaintiff, Miguel A. Figueroa–Rodriguez, brought this action pursuant to 42 U.S.C. § 1983 (1982) against defendants, the Puerto Rico Commercial Development Company ("CDC" or "Company"), Jorge L. Aquino, a former Executive Director of the CDC, and Atilano Cordero Badillo, Puerto Rico's Secretary of Commerce and the President of the CDC.[1] Figueroa claimed, inter alia, that Aquino violated his rights under the First and Fourteenth Amendments when he dismissed Figueroa from his position as Assistant Director of Administration of the CDC. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). *See generally Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (en banc). Seeking damages and reinstatement to his former position, Figueroa alleged he was terminated because he is an active member of the Partido Nuevo Progresista ("PNP") which lost Puerto Rico's 1984 gubernatorial election to the Partido Popular Democratico ("PPD").

Defendants moved for summary judgment both on the merits of plaintiff's claim under current legal standards and on the issue of whether Aquino was shielded from damages liability by the doctrine of qualified immunity. The district court denied this motion. The case was tried to a jury, and at the conclusion of Figueroa's case Aquino moved for a directed verdict, again claiming the protection of qualified immunity. The district court denied this motion. The jury rendered a verdict for Figueroa, awarding him $25,000 in compensatory damages. In the judgment thereafter entered, the district court not only awarded this sum to Figueroa against Aquino but also ordered the CDC and its current Executive Director to reinstate Figueroa to his former position, and ordered them and Aquino to reimburse Figueroa for back pay. Aquino moved for judgment notwithstanding the verdict, asking the district court to reconsider its denial of qualified immunity in light of this court's recent decision in *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255 (1st Cir.1987). Defendants also asked the court under Fed.R. Civ.P. 59(e) to amend its judgment, arguing that the CDC is immune from the award of back pay under the Eleventh Amendment and, in the alternative, that the back pay award should be reduced by Figueroa's interim earnings. The district court denied both motions without giving reasons. Defendants now appeal from the denial of their post-trial motions.[2] We conclude that Aquino was entitled to qualified immunity and hence strike the $25,000 in compensatory damages. We also remand to the district court for further proceedings regarding the award of back pay.

## I. QUALIFIED IMMUNITY

The following facts are not in dispute. Figueroa was appointed as the Assistant Director of Administration of the CDC in

---

1. Figueroa's wife, Olga H. Miranda, was joined in the complaint as a co-plaintiff. On defendants' motion, the district court struck her name from the complaint because she had no individual cause of action against the defendants.

2. Aquino also appeals from the denial of his motion for summary judgment on the basis of qualified immunity. The district court denied this motion not only on the merits but also because it came on the "eve of trial." However, we need not address the latter issue because we find that Aquino was entitled to a directed verdict because of qualified immunity.

We also need not address another issue defendants raise on appeal. In its judgment, the district court ordered defendants to reinstate Figueroa to his former position as defined by his *former* duties, even though those duties have since been amended pursuant to state law. Defendants, in their Rule 59(e) motion and on appeal, argue that this order violated the Eleventh Amendment. We do not address this issue because it has become moot: the day after his reinstatement, Figueroa voluntarily resigned.

1977. He occupied that position until January 1985 when he was fired by defendant Aquino. Figueroa is an active member of the PNP, and his political affiliation was a well-known fact in the Company. After eight consecutive years in power the PNP lost the general elections to the PPD in November 1984. The new Secretary of Commerce, Atilano Cordero, appointed Aquino, with the consent of the Governor of Puerto Rico, to the position of Executive Director of the CDC. Aquino is a member of the PPD. Shortly after assuming the position of Executive Director in January 1985 Aquino fired Figueroa and appointed a member of the PPD to replace him. It is undisputed that Aquino fired Figueroa because of the latter's political affiliation. At trial, the only real issue regarding the merits of Figueroa's claim to have been unconstitutionally discharged was whether party affiliation was an appropriate requirement for the effective performance of the position of Assistant Director of Administration. *See Branti*, 445 U.S. at 518, 100 S.Ct. at 1294–95. The jury, in arriving at a general verdict for plaintiff, necessarily found that, under the law current at the time of trial, party affiliation was not an appropriate requirement for this position.[3]

▮ This appeal is not from the jury's determination of the merits of Figueroa's substantive claim—in particular, its implied conclusion that party affiliation was not an appropriate consideration for his position. Rather, the issue before us is whether the court below erred in denying Aquino's claim that he enjoyed qualified immunity from damages.[4] While the former would relate to whether Figueroa was protected from patronage dismissal under present law as construed by the court, the latter examines whether the law at the time of Figueroa's dismissal was *clearly established* that he enjoyed such protection. We

have recently discussed this critical distinction:

> We emphasize at the outset ... that in deciding this qualified immunity issue, we do not resolve close questions of fact or law related to the merits of the plaintiff's claim in light of the law as it exists today. The applicable standards, as derived from the general rule enunciated in *Mendez–Palou*, reflect the state of the law in early 1985, when [PPD]-appointed officials actually implemented the employment decisions that have resulted in the flood of "patronage dismissal" cases from Puerto Rico. Being particularized reflections of the general state of the law at the time, they are useful only for the narrow purpose of determining what were *not clearly* "protected" governmental positions. In short, our task in disposing of the qualified immunity question is to ascertain "what a reasonable person would have known as to the state of the law" at the time of the alleged unlawful acts, "not what the actual answer is" in the particular case.

*Rodriguez–Burgos v. Electric Energy Authority*, 853 F.2d 31, 34 (1st Cir.1988) (citations omitted) (defendant entitled to summary judgment on qualified immunity from damages but not to summary judgment on merits of plaintiff's claims for injunctive relief). *See also Goyco de Maldonado v. Rivera*, 849 F.2d 683, 686 (1st Cir.1988) (distinguishing between standard applied to review of preliminary injunction, qualified immunity, and merits).

By January 1985 it had, of course, been clearly established in decisions of the Supreme Court that a state employee could not be removed for partisan political reasons from a job as to which party affiliation was not an *appropriate* requirement for its effective performance. *Branti*, 445

---

**3.** We express no opinion as to whether or to what extent it may be proper for a jury rather than the court to determine the question of when political affiliation is a proper requirement for a job. That question, especially if the job description is undisputed, obviously carries a significant legal component. Defendants, however, did not object to the court's reference

of the question to the jury nor to the relevant jury instructions.

**4.** In his brief, Aquino focuses on the qualified immunity question. The few vague references therein that might possibly be read as challenging the jury's finding of unconstitutional discharge are insufficient to raise the matter on appeal.

U.S. at 518, 100 S.Ct. at 1294–95. But the question of what government jobs appropriately included the ingredient of political affiliation was at that time a matter of considerable uncertainty, as the case law in this circuit since then well demonstrates.

The crux of the difficulty lay in determining those upper level management positions that a newly elected governor must constitutionally be allowed the option of filling with like-minded colleagues if meaning is to be given to the electoral mandate. To hold that party affiliation was an inappropriate criterion for most all of Puerto Rico's executive level positions, as our dissenting colleague Judge Torruella construes *Elrod* and *Branti* to mean, would force a new chief executive to govern through a bureaucracy responsive to officials appointed by a political rival—often a rival whom the voters have just rejected at the polls. Numerous decisions of this court, beginning in 1985 *after* the events here in question, have sought to trace the difficult line that divides executive positions where party affiliation is an appropriate criterion from the lesser or specialist offices where party affiliation has no constitutionally cognizable role to play.

▬▬ The question here is thus whether it was objectively clear in January 1985, *before* the appearance of any of this court's precedent in the recent flood of Puerto Rico political firing cases, that Figueroa's Assistant Director position was one to which political affiliation lacked a valid relation. For us to determine this, our above precedent requires that we look, first, at the extent to which the CDC was involved in politically sensitive activities and, second, at the extent to which Figueroa's position could influence those activities. *See Mendez–Palou*, 813 F.2d at 1260–63; *Rodriguez–Burgos*, 853 F.2d at 35; *Goyco de Maldonado*, 849 F.2d at 684–85. While the qualified immunity inquiry is ultimately a question of law, *see Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86

L.Ed.2d 411 (1985); *DeAbadia v. Izquierdo Mora*, 792 F.2d 1187, 1191 (1st Cir.1986), it may also necessitate determining certain of the essential facts. *See Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The underlying facts that inform the qualified immunity inquiry in a case like this concern "the nature of the job responsibilities relative to the government agency's undertakings that might be subject to partisan political disputes." *Rodriguez–Burgos*, 853 F.2d at 35. The material evidence on this was fully developed here at trial,[5] and while there were some facts in dispute, we do not think the resolution of these one way or the other would have any effect on Aquino's right to qualified immunity. We believe that under any version of the evidence Aquino was entitled, as a matter of law, to prevail on his claim of qualified immunity. We, therefore, hold that he was entitled to a directed verdict on that issue.

Turning to the first item of the two-part analysis relevant to qualified immunity, it is clear from the undisputed evidence that the CDC was engaged in a "politically sensitive mission." *Mendez–Palou*, 813 F.2d at 1260. The company was shown to be a public corporation under the control of the Commerce Department of the Commonwealth of Puerto Rico. P.R.Laws Ann. tit. 23, § 251c (1987). It was created to "promote in a planned and efficient form the integrated development of the commercial sector...." Section 251b. Its duties include stimulating private enterprise and participating in commercial activities on its own account or with the participation of others, with special emphasis on aiding small and midsize businesses. Section 251d. It can sue and be sued, section 251e(d); grant loans, section 251f; and acquire property by condemnation, section 251g. Its mandate is politically sensitive since "[e]conomic development ... is one of the most pressing political issues on the island." *Rodriguez–Burgos*, 853 F.2d at 35 (Puerto Rico's Electric Energy Authori-

---

5. This is unlike some of our other qualified immunity decisions where review has been of a decision on a summary judgment motion. A defendant who has appropriately pleaded the affirmative defense of qualified immunity may establish his right to immunity at any point in the proceeding, including at trial.

ty involved in politically sensitive activities).

The second part of the inquiry also comes out in Aquino's favor. The evidence at trial demonstrated that the responsibilities inherent in Figueroa's job would allow him, at least potentially, to influence political matters within the Company. It was brought out that the CDC, which is basically the corporate arm of the Commonwealth's Department of Commerce, is presided over by the Secretary of Commerce. The Secretary appoints the Executive Director of the Company subject to the approval of the Governor of Puerto Rico. The Executive Director in turn appoints his staff, made up of seven assistant directors: 1) Executive Deputy Director, 2) Assistant Director of Administration, 3) Assistant Director of Commercial Facilities, 4) Assistant Director of Budget and Finances, 5) Assistant Director of Comptrolling, 6) Assistant Director of Legal Affairs, and 7) Personnel Director. Figueroa held the position of Assistant Director of Administration, which under Puerto Rico Personnel Law is a noncareer "trust" position ("de confianza"). P.R.Laws Ann. tit. 3, §§ 1349–1351 (1978). At the time he was fired, Figueroa had the fourth or fifth highest salary at the Company. The list of his duties and responsibilities is attached as an appendix to this opinion.

Based on this job description, Figueroa's inherent duties as Assistant Director of Administration could be said to encompass policymaking, and communicative and confidential tasks that could potentially "have a bearing on the partisan goals and policies" of the CDC. *Rodriguez–Burgos,* 853 F.2d at 35; *Mendez–Palou,* 813 F.2d at 1263. It is true that many of Figueroa's duties were related to the day-to-day administration of the Company. For instance, he was responsible for supervising the cleaning and maintenance of the CDC's buildings. But other described responsibilities gave him greater authority that could influence the political mandate of the Company. He could counsel and assist the Executive Director not only in purely administrative matters, but also in sensitive areas such as budget preparation, training and compensation of personnel, and relations with the Company's personnel. He could assist in the "formulation of criterias [sic] for the preparation of the norms and procedures handbooks," draft for his superiors' signature correspondence to the Company's employees regarding administrative policies, and represent his superiors regarding administrative matters with outside organizations. As stated, he was one of the highest paid employees in the Company, *see Ecker v. Cohalan,* 542 F.Supp. 896, 901 (E.D.N.Y.1982) (relative pay a factor to consider), and his position was classified as one of "trust" or "confidence." *See Rodriguez–Burgos,* 853 F.2d at 36 (although not determinative, classification was a factor to consider).

These responsibilities show that it was not clearly established in 1985 that Figueroa's job was purely technical, as it *"potentially* concerned matters of partisan political interest and involved at least a *modicum* of policymaking responsibility, access to confidential information, *or* official communication." *Juarbe–Angueira v. Arias,* 831 F.2d 11, 14 (1st Cir.1987) (emphasis in original). This conclusion is supported by our recent decision in *Mendez–Palou,* 813 F.2d 1255, holding that defendants there possessed qualified immunity. The plaintiff in *Mendez–Palou* had been fired from his position as Director of Administration of the Environmental Quality Board. His duties were very similar to the ones Figueroa had. We held that a person in such a position possesses "top level responsibility for the administration of an agency that could potentially handle matters of partisan political concern with some frequency." *Mendez–Palou,* 813 F.2d at 1260. Although plaintiff's list of duties in that case tended to "stress what might be considered politically neutral 'administrative' functions," *id.* at 1261, we nonetheless held that in 1985 it was not clearly established that a person performing such an array of functions had a constitutional right protecting him from politically motivated dismissal.[6]

---

6. The dissent ignores *Mendez–Palou* and instead relies on *De Choudens v. Government Develop-*

We reach a similar result here, repeating an earlier comment that, "[a]lthough the law seems clear at either end of the *Elrod-Branti* spectrum, not enough precedent dealing with various upper-level governmental positions in the middle of the spectrum [had] yet emerged [in 1985] to enable one to easily classify such a position." *DeAbadia*, 792 F.2d at 1194 (Campbell, C.J., concurring). *See Juarbe-Angueira*, 831 F.2d at 16–17 (collecting cases).

We have held previously that the "inherent powers" of the office control the qualified immunity determination, not what any individual officeholder actually does. *DeAbadia*, 792 F.2d at 1192. In this case, Figueroa's "inherent powers" are evidenced by an undisputed exhibit received in evidence, the list of duties and responsibilities of the Assistant Director of Administration. The fact that this list may be ambiguous at some points and open to various interpretations does not detract from Aquino's qualified immunity claim. *See DeAbadia*, 792 F.2d at 1193 ("the very fact that there is a reasonable dispute means that, from the standpoint of qualified immunity, the law was not clearly established in plaintiff's favor"). The focus is on what Figueroa *could* or *potentially* could do in his job because "we are attempting to ascertain whether defendants could objectively perceive their demotion of the plaintiff to be clearly unlawful." *Rodriguez-Burgos*, 853 F.2d at 36. Given this focus, Aquino was entitled to qualified immunity because it was not clearly established in

January 1985 that political affiliation was not an appropriate requirement for the effective performance of the job of Assistant Director of Administration. Aquino's "actions could reasonably have been thought consistent with the rights [he is] alleged to have violated." *Anderson*, 107 S.Ct. at 3038. Thus he was entitled to a directed verdict on this issue. It follows that the $25,000 in compensatory damages assessed against Aquino must be set aside.

## II. THE BACK PAY AWARD

In its judgment the district court directed the CDC and its current Executive Director to reinstate Figueroa with back pay at the same salary and with the same fringe benefits that he would otherwise have been entitled to but for the discharge.[7] Moving under Fed.R.Civ.P. 59(e) to amend this judgment, defendants argued that the back pay award was barred by the Eleventh Amendment, and, in the alternative, that the award of back pay should be reduced by what Figueroa earned from interim jobs he held between his discharge and reinstatement. The district court denied the motion.

For reasons stated below, we conclude that the CDC is entitled to immunity under the Eleventh Amendment if it is in fact an alter ego of the state, and remand this case to the district court to determine that issue. In addition, we find that, even if the CDC is found not to be entitled to immunity, the

---

ment Bank, 801 F.2d 5 (1st Cir.1986) (en banc), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987), in asserting that Aquino is not entitled to qualified immunity. *De Choudens,* however, is inapplicable to this case because it dealt with the issuance of an interim injunction, not the issue of qualified immunity. *See Goyco de Maldonado,* 849 F.2d at 686.

7. The award of back pay was separate from the $25,000 in damages assessed against Aquino personally pursuant to the jury verdict. The district court's back pay order ran specifically against the CDC itself, its then current Executive Director, and against Aquino "individually and as former executive director of the CDC." The order should not have run against Aquino. He cannot be held liable for the back pay award in an *official* capacity because he no longer works for the CDC. In addition, because Aquino is

entitled to qualified immunity, he can under no theory be held liable in his *individual* capacity for the back pay award, which, in any event, must be paid by or on behalf of the employer by definition. *See Bertot v. School District No. 1,* 613 F.2d 245, 247 (10th Cir.1979) (en banc) (distinguishing between individual capacity and official capacity in applying qualified immunity). To say that an "individual capacity" defendant is liable for "back pay" is a misnomer; he may be liable for compensatory damages in the same amount (plaintiff's lost wages), but such liability must first hurdle any applicable immunity defense. We also note that *Anderson,* 107 S.Ct. at 3040 n. 3, rejected an argument similar to the dissent's contention that Aquino is not immune from the back pay award because he possibly could be indemnified by the Commonwealth of Puerto Rico.

back pay award should be reduced by Figueroa's interim earnings.

### A. *Eleventh Amendment Immunity*

■■■ Defendants have not pursued their Eleventh Amendment defense to the back pay award on this appeal.[8] However, because this defense calls into question a federal court's jurisdiction, we are free to address this issue sua sponte, and do so now. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 466–67, 65 S.Ct. 347, 351–52, 89 L.Ed. 389 (1945); *Echevarria–Gonzalez v. Gonzalez–Chapel*, 849 F.2d 24, 32 (1st Cir.1988). *See generally* C. Wright, A. Miller & E. Cooper, 13 *Federal Practice & Procedure* § 3524, at 167–171 (1984). The Eleventh Amendment, which deprives the federal courts of power to hear claims for damages against any of the United States, has been held to apply to Puerto Rico. *Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694, 697 (1st Cir.1983); *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 776 n. 7 (1st Cir.1981). This court has held previously, in situations similar to this, that the Eleventh Amendment bars an award of back pay against a state or an alter ego of the state. *Fernandez v. Chardon*, 681 F.2d 42, 59 (1st Cir.1982); *Echevarria–Gonzalez*, 849 F.2d at 32. Consequently, it must be first determined whether the CDC should be regarded as an alter ego of the state and thus immune from the back pay award. The factors to be taken into account when determining if an entity is an alter ego of the state are "whether it performs a governmental function, whether it functions with substantial autonomy, to what extent it is financed independently of the state treasury, and if a judgment sought to be entered against

the [entity] will be satisfied out of the state treasury." *Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506, 517 (1st Cir. 1987).

■■ The record before us lacks the information needed to fully consider these factors and reach a conclusion as to whether the CDC is an alter ego of the Commonwealth of Puerto Rico. Information as to the last two factors is especially skimpy. While the statute governing the CDC, P.R. Laws Ann. tit. 23, §§ 251–251w (1978), and parts of the trial record indicate that the CDC performs governmental functions and sheds light on the degree of its autonomy, it is not clear to what extent the CDC is financed independently of the state treasury and whether the back pay award will have to be satisfied out of the state treasury. These latter two factors can be important. *Compare Culebras Enterprises Corp.*, 813 F.2d at 517 (conservation and development authority an alter ego of state) *with Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Authority*, 744 F.2d 880, 886 (1st Cir.1984) (doubtful that defendant was alter ego), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985). *See generally* C. Wright, A. Miller & E. Cooper, 13 *Federal Practice & Procedure* § 3524 (1984).

We thus remand this case for the district court to receive evidence and make the necessary findings of fact relative to whether the CDC is an alter ego of the Commonwealth of Puerto Rico. In making this determination, the district court should examine, in light of the case law and the four factors set forth in *Culebras Enterprises Corp.*, the statutory sections governing the CDC and the evidence presented by the parties. If the district court finds that the CDC is not an alter ego of the Commonwealth, it may reenter the back pay award.

---

**8.** Defendants' failure to raise this issue on appeal does not constitute a waiver of their Eleventh Amendment immunity under the circumstances of this case. Defendants did plead their Eleventh Amendment immunity as an affirmative defense in their answer to the complaint. They also, as previously mentioned, raised the issue in their Rule 59 motion to amend the judgment below, and both parties briefed and argued the issue at this time. A waiver of Eleventh Amendment immunity will not be inferred easily. *See Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360–61; *Della Grotta v. Rhode Island*, 781 F.2d 343, 346 (1st Cir.1986).

If the district court should find that the CDC is an alter ego of the Commonwealth, another possible issue would remain: whether P.R. Laws Ann. tit. 23, § 251e(d), which grants the CDC the power "to sue and be sued," comprises a waiver of the Commonwealth's Eleventh Amendment immunity to suit in federal court. While section 251e(d) seems to waive the defense of sovereign immunity in the Commonwealth's courts, it does not follow from this that Puerto Rico's legislature intended to waive the Commonwealth's *Eleventh Amendment* immunity to suit in *federal* court. "In deciding whether a state has waived its constitutional protection under the Eleventh Amendment, [a federal court] will find waiver only where stated 'by the most express language or by such overwhelming implications from the test as [will] leave no room for any other reasonable construction.'" *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361. *See also Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238–40, 105 S.Ct. 3142, 3145–46, 87 L.Ed. 2d 171 (1985); *Culebras Enterprises Corp.,* 813 F.2d at 517 n. 9; *Della Grotta v. Rhode Island,* 781 F.2d 343, 346–47 (1st Cir.1986).

▇ In *Della Grotta,* 781 F.2d at 346–47, even though the language of the Rhode Island statute did not expressly waive Eleventh Amendment immunity, this Court held that Rhode Island had waived such immunity where the Rhode Island Supreme Court, in response to a question certified by a federal district court in another case, had found that a Rhode Island statute " 'manifest[ed] ... a legislative intent' to waive the State's eleventh amendment immunity to suit in federal court." Our research has uncovered no ruling by the Supreme Court of Puerto Rico holding that section 251e(d) comprises a waiver of Eleventh Amendment immunity. Consequently, if the district court should find on remand that the CDC is an alter ego of the Commonwealth, the inexplicit language of section 251e(d), standing alone, would not constitute a sufficient basis from which to find a waiver of the Commonwealth's Eleventh Amendment immunity to suit in federal court. *Edelman,* 415 U.S. at 673, 94

S.Ct. at 1360–61. *Atascadero,* 473 U.S. 238–40, 105 S.Ct. at 3145–46. However, if the district court felt there was special reason to do so, it could certify the issue to the Supreme Court of Puerto Rico, whose finding of waiver, if made, would be binding under our holding in *Della Grotta* notwithstanding the statute's lack of explicit language.

To summarize, if the district court finds that the CDC is not an alter ego of the Commonwealth, it may reenter the back pay award. If instead it finds that the CDC is such an alter ego, it may (but need not) certify to the Supreme Court of Puerto Rico the question of whether section 251e(d) comprises a waiver of Eleventh Amendment immunity in this case. If the answer to this question is "yes," the district court may reenter the back pay award. If the answer is "no," the CDC is immune from the back pay award.

B. *Reduction of Back Pay Award by Interim Earnings*

▇ Even if it is determined after remand that the CDC is not immune from the back pay award, we hold that the award of back pay must be reduced by Figueroa's interim earnings. Figueroa asks us to follow *Torres Cartagena v. Secretary of Education,* 94 P.R.R. 660 (1967), which held that an improperly discharged teacher was entitled to back pay without any reduction for interim wages. However, the measure of damages in section 1983 actions is a matter of federal common law. *See Carey v. Piphus,* 435 U.S. 247, 257–59, 98 S.Ct. 1042, 1049–50, 55 L.Ed.2d 252 (1987); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238–40, 90 S.Ct. 400, 405–06, 24 L.Ed.2d 386 (1969); *Furtado v. Bishop,* 604 F.2d 80, 97 (1st Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). Looking to federal common law, then, it appears well settled that interim earnings should be set off against back pay awards. *See, e.g., Barnes v. Bosley,* 828 F.2d 1253, 1258 (8th Cir.1987); *Harkless v. Sweeny Independent School District,* 427 F.2d 319, 324 (5th Cir.1970), *cert. denied,* 400 U.S. 991,

91 S.Ct. 451, 27 L.Ed.2d 439 (1971); *Clary v. Irvin*, 501 F.Supp. 706, 712 (E.D.Tex. 1980); *Eckerd v. Indian River School District*, 475 F.Supp. 1350, 1365–66 (D.Del. 1979). *But see Johnson v. Mid States Screw & Bolt Co.*, 733 F.2d 1535, 1550 (11th Cir.1984). Such a setoff accords with the basic purpose of a section 1983 damages award: "to compensate persons for injuries caused by the deprivation of constitutional rights...." *Carey*, 435 U.S. at 254, 98 S.Ct. at 1047. Disallowing a setoff would go beyond compensation by putting plaintiff in a better position than had his rights not been violated. This is both inappropriate and unnecessary. "To the extent that Congress intended that awards under § 1983 should deter the deprivation of constitutional rights, there is no evidence that it meant to establish a deterrent more formidable than that inherent in the award of compensatory damages." *Carey*, 435 U.S. at 256–57, 98 S.Ct. at 1048–49. Such a setoff accords with normal damages principles. *See Restatement (Second) of Contracts* § 347, comment d (1979). *See also Zarcone v. Perry*, 572 F.2d 52, 55 (2d Cir. 1978) (general principles of damages apply to civil rights action).

Figueroa testified at trial concerning his employment and earnings between his discharge and reinstatement. On remand, if it is found that the CDC is not immune from the back pay award, the district court should determine the amount by which Figueroa's back pay award must be reduced to reflect his interim earnings and reduce the award accordingly.

To summarize, (1) Aquino was entitled to qualified immunity from damages. The damages award of $25,000 assessed against him is vacated. Aquino is also not liable for the back pay award. (2) Unless the Supreme Court of Puerto Rico finds a waiver of Eleventh Amendment immunity in this case, the CDC is immune from the award of back pay under the Eleventh Amendment if it is found to be an alter ego of the Commonwealth. If the district court determines on remand that the CDC is not such an alter ego, it may reenter the back pay award against the CDC; however, the back pay award must be reduced by Figueroa's interim earnings. If the district court instead determines that the CDC is an alter ego of the Commonwealth, it may (but need not) certify to the Supreme Court of Puerto Rico the question of whether there has been a waiver of the Commonwealth's Eleventh Amendment immunity in this case. If it is found on such a certification that there has been such a waiver, the reduced back pay award may be reentered, otherwise not.

*Vacated and remanded for further proceedings consistent herewith.*

## APPENDIX

### DUTIES AND RESPONSIBILITIES

1.  Will assess [sic] the Executive Director through the Executive Subdirector in matters and affairs related to all the administrative areas, in harmony with the Company's programming policy.

2.  In coordination with the Executive Subdirector and the Deputy Director of Finances–Comptroller, shall take part in matters related to the Company's systems and operational procedures, assisting in the formulation of criterias [sic] for the preparation of the norms and procedures handbooks.

3.  Will assess [sic] the Executive Director, through the Executive Subdirector, in the preparation of projections for human resources, compensation and fringe benefits and, in harmony herewith, will collaborate in the preparation of the Company's functional budget.

4.  Will plan, coordinate and supervise, with prior approval from the Director and Subdirector, the programming, negotiation and offers of training and instruction of the Company's human resources in tune with the guidelines of short and long term objectives.

5.  Will direct, coordinate and supervise the personnel and the operations, affairs and matters related to the administration of the Company's personnel affairs, including the administration of fringe benefits.

6. Will direct, coordinate and supervise the personnel and functions related to the negotiations of purchases or equipment acquisition, supplies and/or services required by the Company.

7. Will provide and/or supervise the provisions of administrative services, which include the services of reproduction of documents, inside and outside messengers, telephone services and the reception and attention to visitors.

8. Will participate in the coordination of business related to the Building administration on which the Company offices are located, keeping alert to the necessary steps and negotiations so as to maintain the employees' physical security and the provision of cleaning and maintenance services of the physical plant.

9. Will direct, coordinate and supervise the personnel and its labors pursuant to the administration of documents, which include the receiving, distribution and the handling of valuables and other correspondence received and originated at this Company and the procedures pursuant to the Central Files which envolve [sic] coding and filing of documents. Will supervise the preparation and execution of the disposal of the Company's documents, in tune with the applicable regulations.

10. Will draft for the Executive Director or the Executive Subdirector's signature the correspondence to be sent to Company officers and employees related to the services abovementioned that would imply the establishment of new administrative policies or modification or reinterpretation of existing ones, and other correspondence, memorandums and documents related to their functions or that they may require.

11. Will represent the Executive Director and/or the Executive Subdirector, will coordinate and serve as the Company's contact agent with other organizations and government people and private persons in matters, business and transaction of services confined to the Administration Area.

12. Will perform other functions inherent to the position.

TORRUELLA, Circuit Judge (dissenting in part; concurring in part).

In *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court sought to protect public employees from the ravages of the partisan spoils system, in order to promote First Amendment values as well as to exalt principles of good government. Although we have not yet taken the final, bold step of openly reversing these cases and the tenets for which they stand, in this appeal we come one step closer to this proscribed outcome. By disallowing the grant of back pay to political discriminatees notwithstanding a demonstration of entitlement to equitable relief, the majority further dilutes *Branti* and *Elrod* to the point of total ineffectiveness. A brief analysis of the majority's reasoning on both the qualified immunity and back pay issues suffices to substantiate this conclusion.

## I. *Qualified Immunity*

Three remedies have traditionally been available to political discriminates in actions brought under 42 U.S.C. § 1983: (1) damages, (2) reinstatement, and (3) back pay. Reinstatement and back pay, although technically separate remedies, have as a matter of course been granted together in equitable actions for specific relief. *See Bertot v. School Dist. No. 1*, 613 F.2d 245, 250 (10th Cir.1979) (en banc) ("We hold that an award of back pay is an element of equitable relief, and that equitable relief is not precluded by a good faith defense"); *Harmon v. May Broadcasting Co.*, 583 F.2d 410, 411 (8th Cir.1978) ("An award of back pay ... is an integral part of the equitable remedy of reinstatement and is not comparable to damages in a common law action...."); *McFerren v. County Board of Education*, 455 F.2d 199, 202 (6th Cir.1972) (" '[B]ack pay is not a claim for damages, but is an integral part of the equitable remedy of injunctive reinstatement' ") (quoting *Harkless v. Sweeny Independent School District*, 427 F.2d 319, 323–24 (5th Cir.1970)); *see also Bowen v.*

**1048**

*Massachusetts,* —— U.S. ——, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1988).

The allowance of damages is subject to the restrictions imposed by the doctrine of qualified immunity, whereby public officials are exempt from the payment of damages in § 1983 actions if they can affirmatively demonstrate that "their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "All [the court] need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). The Supreme Court further refined the meaning of "clearly established law" in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), in which it stated:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent. (Citations omitted).

The test for determining what is "clearly established law" in this circuit, however, is different, a difference upon which I have previously had occasion to comment. *Goyco de Maldonado v. Rivera,* 849 F.2d 683, 690 (1st Cir.1988) (Torruella, J., dissenting); *Juarbe–Angueira v. Arias,* 831 F.2d 11, 17 (1st Cir.1987) (Torruella, J., dissenting), *cert. denied,* —— U.S. ——, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988); *Quintana v. Anselmi,* 817 F.2d 891, 893 (1st Cir.1987) (Torruella, J., dissenting); *Raffucci Alvarado v. Zayas,* 816 F.2d 818, 822 (1st Cir.1987) (Torruella, J., dissenting); *Rosado v. Zayas,* 813 F.2d 1263, 1267 (1st Cir.1987) (Torruella, J., dissenting); *Rodríguez Rodríguez v. Muñoz Muñoz,* 808 F.2d 138, 149 (1st Cir.1986) (Torruella, J., dissenting); *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1204 (1st Cir.1986) (Torruella, J., dissenting). The majority opinion highlights the inherent fallacies in the standards adopted by this circuit for these purposes.

The majority states that I would rule "that party affiliation was an inappropriate criterion for most all of Puerto Rico's executive level positions ... [which] would force a new chief executive to govern through a bureaucracy responsive to officials appointed by a political rival." *See ante* at 1041. This characterization of my position states too little, of course. Government employees at all levels must, like federal judges, comply with their oath of office irrespective of who has appointed them to their office. But, "[T]he Court has consistently recognized that mere political association is an inadequate basis for imputing disposition of ill-willed conduct." *Elrod v. Burns,* 427 U.S. at 365, 96 S.Ct. at 2685. "[E]mployees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist." *Id.* at 366, 96 S.Ct. at 2686. *See also Mt. Health City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). That party affiliation is an inappropriate criteria for retaining a government job, executive or otherwise, is not of my invention. *See Branti v. Finkel, supra, and Elrod v. Burns, supra.* Such a requirement is the exception rather than the rule, as appears to be from the opinions of this circuit.

Applying what is by now circuit rote, the majority concludes that CDC meets the first test of its two part analysis (whether the government agency in question "was involved in politically sensitive activities"). *Ante* at 1041. But this first test, as construed by the majority, is a non-test. The majority seems to believe that *every* government agency, department or entity is by its very nature involved in a "politically sensitive activity." In fact, no governmental agency analyzed by our court for these purposes has *ever* failed this test. *See, e.g., Goyco de Maldonado, supra,* (Housing Bank); *Fontane–Rexach v. Puerto Rico Electric Power Authority,* No. 87–1801 (1st Cir. April 22, 1988) (Power Au-

thority); *Méndez–Palou v. Rohena–Betancourt*, 813 F.2d 1255 (1st Cir.1987) (Environmental Quality Board; Aqueduct and Sewer Authority; Department of Agriculture); *Rosado v. Zayas, supra,* (Department of Social Services; Planning Board); *De Choudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986) (Government Development Bank), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987); *Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258 (1st Cir. 1987) (Rural Housing Administration); *Jiménez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (Urban Development and Housing Corporation), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987); *Juarbe–Angueira v. Arias, supra,* (Public Buildings Authority); *Quintana v. Anselmi, supra,* (Right to Work Administration); *Monge Vázquez v. Rohena Betancourt,* 813 F.2d 22 (1st Cir. 1987) (Department of Natural Resources); *De Abadia v. Izquierdo Mora, supra,* (Department of Health). If there is *any* governmental agency which does not satisfy the first test, as construed by the majority, I invite anyone to call it to my attention.

The second part of the circuit analysis suffers from similar infirmities. The inquiry here focuses on the individual position in question, to determine whether its inherent responsibilities allow the incumbent, "at least potentially, to influence political matters" within the agency in question. *Ante* at 1042. It is difficult, if not impossible, to find a position that could not *potentially* influence political matters. This is a dragnet from which escape has proved impossible.

In applying these two tests, the majority confers every benefit and presumption to the transgressing official while constitutionally dispossessing the discharged employee. The only way that a defendant could fail the majority's non-test is if a court had previously held that the very position in question was immune from polit-

ically motivated dismissals. Thus, this circuit has transformed a doctrine that was intended to confer qualified immunity, into one that guarantees absolute immunity.

The basic flaw with the majority's two-prong analysis is that it undermines exactly what the *Branti* Court considered paramount. There, the Court was striking down discrimination based on political party membership, where "party membership was [not] *essential* to the discharge of the employee's governmental responsibilities." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95 (emphasis added). The Court emphatically stated that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* That declaration is not a watered down *apologiae* for the partisan spoils system; it is a strong policy statement against it. Yet this circuit, in letter and in spirit, fosters exactly the opposite result. The bottom line is that the majority's lax standards prevent political discriminatees from obtaining compensatory damages, "the only realistic avenue for vindication of constitutional guarantees," *Anderson,* 107 S.Ct. at 3038 (quoting *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736).[9] In this circuit, qualified immunity is tantamount to absolute immunity.

Even if the two-part analysis is accepted, proper application would lead to a different result. A reading of the discriminatee's duties and responsibilities, *ante* at 1046–47, would appear to establish that plaintiff's duties were of a purely administrative or technical nature, falling squarely within the scope of that least-cited and most-ignored circuit precedent, *De Choudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986) (en banc), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987).[10] When one compares the duties

---

9. *See also Mitchell v. Forsyth,* 472 U.S. at 523 n. 7, 105 S.Ct. at 2814 n 7; *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 398–411, 91

S.Ct. 1999, 2005–12, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring).

10. The majority in turn considers that I "ignore" *Méndez Palou* and *Goyco Maldonado. See ante*

*actually* exercised by plaintiff in *De Choudens,* a case in which we ruled that a senior vice-president of the Puerto Rico Government Development Bank did not hold a position that related to partisan concerns, *id.* at 10, with even the most imaginative interpretation of those duties *potentially* within appellee's job description in the present appeal, one is left at a loss to explain the majority's reasoning or conclusion in granting defendants qualified immunity. I think there was clearly established law to the effect that party affiliation was not an appropriate requirement for the plaintiff's position. Accordingly, I do not find defendants' actions protected by qualified immunity.

Even if I were to agree that the defendants' enjoyed qualified immunity, however, I would still hold that they were liable for back pay. I now turn to the majority's rulings on reinstatement and back pay.

## II. *Reinstatement and Back Pay*

Reinstatement in political discharge cases is an ineffective remedy when unaccompanied by the payment of the employee's lost wages or compensation for the damages suffered by him and his family. Reinstatement alone merely places the discharged employee in a hostile environment, subjected to subtle but nevertheless real harassment and intimidation of a kind difficult to prove in court, even assuming that it is actionable.[11] The result is entirely predictable. The reinstated employee will in all likelihood be unable to withstand the chilling pressures to which he will be subjected, as happened in this case. *See ante* at 1039 n. 2. Reinstatement alone fails to provide an effective deterrent to the recurrence of unconstitutional conduct by the public official. This court cannot in justice

continue to overlook these realities of the governmental work-place.

Following traditional principles of equity jurisdiction, the district court in ordering reinstatement also awarded plaintiff back pay as part of the equitable relief. *See* cases cited *supra* at 1047. Appellant-defendants raised an Eleventh Amendment immunity defense before the district court in their answer and, after judgment, this defense was renewed in their Rule 59 motion to amend the judgment. They did not, however, pursue this issue on appeal.

The majority, *motu proprio,* raises and decides this important question. I cannot, of course, technically challenge its power to rule upon this matter in such a fashion. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984). I do, however, have serious doubts whether, under the circumstances of this appeal, it is wise to proceed by such an expediency. We have not received the benefit of briefs or arguments from the parties. In fact, we have not even notified them that we are considering, much less deciding, this issue. Particularly because of CDC's *de facto* waiver of this question on appeal, our failure to give the parties the opportunity to be heard before we consider and decide it borders on a denial of due process.

Furthermore, I do not think that the CDC's failure to appeal the Eleventh Amendment issue is coincidental or a mere oversight. Defendants-appellants are not *pro se* litigants. They are represented by the Solicitor General of Puerto Rico. If such a party chose not to claim this defense on appeal we can be certain that it was for a good reason. It should be noted that in all the cases cited by the majority for the proposition that the Eleventh Amendment

---

at 1042–43 n. 6. This is not entirely correct. It would be more accurate to say that I disagree with these cases. *See Rosado v. Zayas,* 813 F.2d 1263, 1267 (1st Cir.1987) (Torruella, J., dissenting); *Goyco Maldonado v. Rivera,* 849 F.2d at 690 (Torruella, J., dissenting).

**11.** We are presently engaged in debating whether conduct short of a discharge is actionable under *Branti. See Agosto de Feliciano v. Aponte Roque,* No. 86–1300, slip op. (1st Cir. Aug. 14,

1987) [1987 WL 39747] and *Torres Hernández v. Padilla,* Nos. 86–1643, 86–1644, slip op. (1st Cir. June 22, 1987) [1987 WL 39748] *opinions withdrawn and en banc pending.* The Second Circuit has already decided that a cause of action is stated under 42 U.S.C. § 1983 "whenever under color of state law unfavorable action is taken against a person on account of that person's political activities or affiliation." *See Lieberman v. Reisman,* 857 F.2d 896 (2d Cir.1988).

bars the back pay recovery, this defense was affirmatively claimed and urged on appeal by the governmental *alter ego*. *See, e.g., Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 236, 105 S.Ct. 3142, 3144, 87 L.Ed.2d 171 (1985); *Pennhurst State School & Hospital*, 465 U.S. at 96–97, 104 S.Ct. at 905–06; *Edelman v. Jordan*, 415 U.S. 651, 657–58, 94 S.Ct. 1347, 1353–54, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 467, 65 S.Ct. 347, 352, 89 L.Ed. 389 (1945); *Echevarría–González v. González–Chapel*, 849 F.2d 24, 32 (1st Cir. 1988); *Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506, 517 (1st Cir.1987); *Della Grotta v. Rhode Island*, 781 F.2d 343, 345 (1st Cir.1986); *Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Authority*, 744 F.2d 880, 882 (1st Cir.1984), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); *Fernández v. Chardón*, 681 F.2d 42, 46 (1st Cir.1982), *aff'd sub nom. Chardón v. Fumero Soto*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). Surely the Solicitor General's actions in withdrawing this issue on appeal must have some significance, particularly after specific adverse rulings had been entered by the district court on this point.

Even assuming this case presents an appropriate opportunity to address this important constitutional question, I would have reached a different result. Whether the CDC is immune from suit under the Eleventh Amendment [12] depends on whether it is the *alter ego* of the state. *See Blake v. Kline*, 612 F.2d 718, 721 (3d Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). Nine factors are relevant to the resolution of this question:

> * * * [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most

important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

*Id.* at 722 (quoting from *Urbano v. Board of Managers of New Jersey State Prison*, 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970)).

On the narrow issue of whether CDC is entitled to Eleventh Amendment protection, I believe that we need go no further than the record in this case and the statute creating CDC to find the answer. The CDC was created by 23 L.P.R.A. § 251c (1987). Section 251c(d) specifically states that "[t]he Company shall have legal personality separate from every officer thereof, from the Government of the Commonwealth and from other public corporations. The activities of the Company shall not bind the credit of the Commonwealth of Puerto Rico or its political subdivisions." Although the purpose of the CDC is to "stimulate private enterprise to promote, initiate and maintain in operation every kind of business activities and commercial centers," § 251d(a), it "may participate in commercial activities on its own exclusive account," § 251d(b). Furthermore, CDC has the power to sue and be sued; to acquire, possess, and sell property; to borrow money and issue debt; and to form subsidiaries. *See* § 251e(d), (h), (j), and (m). The CDC is empowered to receive funds

---

**12.** The Eleventh Amendment states:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

from private parties to fund its activities. § 251h. The funds of the CDC shall be deposited in qualified depositaries of the Commonwealth, but shall be kept in "the name of the Company." § 251m. Most important is the provision in Section 251o that states that "[t]he bonds and other obligations issued by the Company shall not be a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions. And neither the Commonwealth nor any such municipalities or other political subdivisions shall be liable thereon, nor shall such bonds or other obligations be payable out of funds other than those of the Company."

Counter-indicative of governmental independence are provisions that state that the CDC shall be "attached" to the Commonwealth's Department of Commerce (§ 251c(b)); that the powers of the CDC shall be vested in the Commonwealth's Secretary of Commerce, who shall be its President (§ 251c(c)); that the CDC may acquire property by condemnation (§ 251g); and that the CDC and its properties are exempt from Commonwealth and municipal taxes and imports (§ 251r).

I am convinced, based on the statute, that CDC is not the alter ego of the Commonwealth for purposes of the Eleventh Amendment. Although some factors suggest otherwise (the main one being that CDC is controlled by the Secretary of Commerce and his nominees), they are outweighed by those factors that point in the opposite direction. CDC is an independent entity that possesses the power to enter into contracts, issue debt, to sue and to be sued. Most persuasive is the fact that Puerto Rico has officially immunized itself from liability for CDC's operations. I see no reason to remand this case for factual findings on the alter ego issue. Cf. *Ainsworth Aristocrat International Pty. Lmtd. v. Tourism Company of the Commonwealth of Puerto Rico*, 818 F.2d 1034, 1038 (1st Cir.1984). Even if, *arguendo*, the district court were to find that the Commonwealth controls CDC and always pays

off its debts, I would still hold that Puerto Rico's sovereign immunity does not bar damage awards against CDC.[13] Puerto Rico cannot distance itself from CDC in state court while simultaneously claiming that CDC is its alter ego in federal court. "Having one's cake and eating it, too, is not in fashion in this circuit." *United States v. Tierney*, 760 F.2d 382, 388 (1st Cir.1985).

This result would make unnecessary our raising and deciding, *motu proprio*, the broader constitutional question of whether the Eleventh Amendment bars the recovery of back pay in § 1983 actions in federal courts. Because it is axiomatic that federal courts should decide cases on non-constitutional grounds when possible *Ashwander v. TVA*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), I believe the majority errs in addressing the constitutional issue.

Even if I had to decide the constitutional issue, I would hold that the back pay award is not barred by the Eleventh Amendment in this case. Irrespective of the status of CDC as an *alter ego* of Puerto Rico, these defendants are also being sued in their *personal* capacity. No Eleventh Amendment concerns are raised if the monetary relief is not "paid from public funds in the state treasury," but rather is paid "from the pockets of the individual state officials who were defendants in the action." *Edelman*, 415 U.S. at 663, 668, 94 S.Ct. at 1358.

Contrary to the contention of the majority, *ante* at 1042–43 n. 6, I do not believe that the granting of qualified immunity to defendants from an action at law in damages affects the back pay remedy against defendants in their *individual* capacity, because it is allowable within the court's equity jurisdiction. The equity jurisdiction of the district courts is unaffected by the doctrine of qualified immunity which concerns the granting of compensatory damages at law. *See Wood v. Strickland*, 420 U.S. 308, 315 n. 6, 95 S.Ct. 992, 997 n. 6, 43

---

**13.** A contrary holding, it seems to me, would suggest that judgments against state officers in their private capacity, which are almost always

paid by the state, *see infra* note 13 and accompanying text, are also barred by the Eleventh Amendment.

L.Ed.2d 214 (1975); *Brown v. Bathke,* 566 F.2d 588, 593 (8th Cir.1977). In distinguishing between a recovery for damages in an action at law and an action in equity for monetary relief, the Supreme Court recently ruled in *Bowen v. Massachusetts:*

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with back pay ...

108 S.Ct. at 2731–32.

This is an important distinction in view of the specific language in Section 1983 which pointedly separates the relief available "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. The gravamen of this contention is even more significant when compared to the statutory language in *Bowen,* in which 5 U.S.C. § 702 was being considered. The issue to be decided was whether Massachusetts' claim against the Secretary of Health for the retroactive payment of funds was an action at law for money damages, or an equitable claim for relief. The Court held that the language of Section 702 in question, *e.g.,* "[a]n action in a court of the United States seeking relief other than money damages ...," permitted a declaratory judgment suit in district court which, in addition to declaring the rights of Massachusetts under the federal statute, also ordered the Secretary to pay *retroactively* the funds it had failed to pay pursuant to its erroneous interpretation of the law, because such a payment was *part of the equitable claim for relief.*

This is precisely the case as relates to the back pay order entered here by the district judge, separate from the damage awards in the jury verdicts. The district court granted equitable relief in the form of reinstatement and back pay. These orders, as against the individual defendants, should stand as part of the equitable claim for relief which is unaffected by defenses to the legal damages judgment.[14]

It should be noted that in deciding cases under Section 1983, federal courts have long recognized the equitable nature of back pay awards. *See Whiting v. Jackson State University,* 616 F.2d 116, 122 n. 3 (5th Cir.1980); *Moore v. Tangipahoa Parish School Bd.,* 594 F.2d 489, 494 (5th Cir.1979); *Burt v. Board of Trustees of Edgefield County School Dist.,* 521 F.2d 1201, 1205 (4th Cir.1975); *Demkowicz v. Endry,* 411 F.Supp. 1184, 1191 (D.C.Ohio 1975); *Mabey v. Reagan,* 376 F.Supp. 216, 225 (N.D.Cal.1974), *rev'd on other grounds,* 537 F.2d 1036 (9th Cir.1976); *Adamian v. University of Nevada,* 359 F.Supp. 825, 831 (D.C.Nev.1973), *rev'd on other grounds,* 523 F.2d 929 (9th Cir.1975).

It could be argued that the same policy reasons that justify granting qualified immunity to governmental executives in damage actions, *e.g.,* "that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," *Anderson v. Creighton,* 107 S.Ct. at 3038, are equally applicable to back pay recoveries against officials in their individual capacity. Accepting such a proposition as valid on its face is misleading within the framework of the actual circumstances of *this* case. Although the specific coverage varies, in Puerto Rico and 47 other non-federal jurisdictions, statutes

---

**14.** Although I am aware that the Sixth Circuit in *Stern v. Shouldice,* 706 F.2d 742, 750 (6th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983) has held otherwise, I do not agree with the reasoning or conclusion reached. In my view whether a remedy is equitable or legal depends not on *who* is being sued, which is the basis of that court's findings, but on the nature of the *remedy* sought. *See Bertot v. School Dist. No. 1 Albany County,* 613 F.2d 245, 250 (10th Cir.1979) ("we hold that an award of back pay is an element of equitable relief and

that equitable relief is not precluded by a good faith defense."). *See also Sullivan v. School Board of Pinellas County,* 773 F.2d 1182, 1187 (11th Cir.1985); *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 929 (9th Cir.1982); *Laskaris v. Thornburgh,* 733 F.2d 260, 263 (3d Cir.), *cert. denied,* 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984); *Harkless v. Sweeny Independent School District,* 427 F.2d 319, 323–24 (5th Cir. 1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).

generally provide officials with *indemnification* from monetary damages in suits such as the present one, as well as providing legal representation for defense in the litigation.[15]

In the case of Puerto Rico, the applicable statute is 32 L.P.R.A. §§ 3085–3092a, which provides in § 3085:

> Every official, ex-official, employee or ex-employee of the Commonwealth of Puerto Rico who is sued for damages in his personal capacity, when the cause of action is based on alleged violations of the plaintiff's civil rights, due to acts or omissions committed in good faith, in the course of his employment and within the scope of his functions, may request the Commonwealth of Puerto Rico to provide him with legal representation, and to subsequently assume the payment of any judgment that may be entered against his person. Executive Directors, ex-Executive Directors, members and ex-members of the Governing Boards of public corporations and Government instrumentalities, mayors and ex-mayors and officials and ex-officials of the municipalities shall be covered by these provisions except that, for the payment of judgments they shall be governed by the provisions of section 3092 of this title. Any action brought under the provisions of sections 3077–3084 of this title shall not be covered by the provisions of this section.
>
> Likewise, these provisions shall not be construed, for any reason whatsoever, as making the Commonwealth an insurer of the aforesaid public servants, nor as a waiver of the sovereign immunity of the Commonwealth.

Because of this statute, the fear expressed by the Supreme Court in the *Anderson v. Creighton* line of cases is totally unfounded with regard to Puerto Rican officials that are sued for back pay in an individual capacity.

Appellee should be entitled to the award of back pay against individual defendants in their personal capacity because the award is against an individual, one who obviously cannot fit the requirement of an *alter ego* of the state. There is no direct payment from the public treasury—the judgment is against the individual, who can, however, seek indemnity from the state.

### III. *Reduction of the Back Pay Award*

I concur with the majority's conclusion that interim earnings should reduce the back pay award. There are strong policy reasons in favor of encouraging the mitigation of damages, particularly where equitable relief is being requested.

**15.** *See* Ala.Code § 41–9–74 (1975); Ariz.Rev. Stat.Ann. § 12–820 *et seq.* (1984); Ariz.Stat.Ann. § 12–3401 (1977); Cal.Govt.Code § 825 *et seq.* (West 1979); Colo.Rev.Stat. § 24–10–110 (1963); Conn.Gen.Stat.Ann. § 29–8a (1984); Del.Code Ann. tit. 10, § 4002 (1979); Fla.Stat. § 111.071 (1985) & § 111.071 (1982); Ga.Code Ann. § 89–973 (1985) (ins. scheme) Recodified as § 45–9–1 (1982); Hawaii Rev.Stat. § 662–14; Idaho Code § 6–903 (1985); Ill.Rev.Stat. ch. 85, §§ 1–101—10–101 (1966) ch. 127, § 63b4 (1985) (insurance scheme); Ind.Code Ann. §§ 34–4–16.5–1—34–4.16.5–19 (West 1985); Iowa Code Ann. § 25A.21 (West 1985); Kan.Stat.Ann. § 75–6109 (1984); La.Rev.Stat.Ann. §§ 13:5108.-1, 13:5108.2 (West 1985); Me.Rev.Stat.Ann. tit. 14, § 8112 (1980); Md.State Govt.Code Ann. §§ 12–309, 12–310 (1986); Mass.Gen.Laws Ann. ch. 12, § 3E (West 1984) (employees within Executive Office of Human Services or Dept. of Education); Mass.Gen.Laws Ann. ch. 258, §§ 9, 9A, 10 (1984 ed.); Mich.Comp.Laws Ann. § 691.1408 (West 1985); Minn.Stat.Ann. § 3.736(9) (West 1985); Mo.Rev.Stat. § 105.711 (1985); Mont.Code Ann. § 2–9–305 (1983); Neb. Rev.Stat. § 81–8, 239.06 (1981); Nev.Rev.Stat. § 41.0349 (1979); N.H.Rev.Stat.Ann. ch. 99–D (1983); N.J.Rev.Stat. § 59:10–1 *et seq.* (1984); N.M.Stat.Ann. § 41–4–1 *et seq.* (1985); N.Y.Pub. Off.Law § 17 (McKinney 1984–1985); N.C.Gen. Stat. § 143–300.16 (1983); N.D.Cent.Code § 32–12.1–15 (1981); Ohio Rev.Code Ann. § 109.36 *et seq.* (Baldwin 1984) (representation of office or employee); Okla.Stat.Ann. tit. 51, § 153 (1984); Or.Rev.Stat. § 30.285 (1967); Pa. Stat.Ann. tit. 71, § 634 (Purdon 1962) (ins. scheme); R.I.Gen.Laws §§ 9–31–2, 3, 8, 9, 12 (1984); S.C.Code Ann. § 15–77–230 (Law Coop. 1984) (only pertains to motor vehicles); S.D. Comp.Laws Ann. §§ 3–19–1 to –3 (1980); Tenn. Code Ann. §§ 29–20–107, 205, 310, 404 (1980) (1985 Supp.); Tex.Stat.Ann. art. 6252–56 (Vernon 1985); Utah Code Ann. §§ 63–30–4, 20, 33, 37 (1978) (1983 Supp.); Vt.Stat.Ann. tit. 12, §§ 5601, 5602, 5605 (1973); Va.Code §§ 8.01–195.3, 195.8 (1984); Wash.Rev.Code Ann. §§ 4.92.060, 4.92.070 (1986); W.Va.Code § 7–14A–2 to 4 (1984) (applies to deputy sheriff only); Wis.Stat.Ann. §§ 893.80, 893.82, 895.46 (1983) (1985 Supp.); Wyo.Stat. §§ 1–39–103, 104, 116 (1985).

IV. *Conclusion*

This circuit has slowly but surely emasculated the principles espoused by *Branti* and *Elrod.* Unfortunately we have received scant subsequent guidance from the Supreme Court as to whether they are still the law of the land. Until the Court clarifies the situation, I cannot understand why alleged discriminatees continue to seek relief under 42 U.S.C. § 1983 in the Federal court for Puerto Rico. Pursuant to the decisions of the Supreme Court of Puerto Rico, which we have refused to follow, *see Jiménez Fuentes v. Torres Gaztambide,* 807 F.2d at 243 n. 9, the courts of Puerto Rico would presumably grant the relief to litigants which we have denied. *See Ramos–Villanueva v. Secretario de Comercio,* 112 P.R.R. 514 (1982); *Colón v. Urban Renewal and Housing Corporations,* 84 J.T.S. 52 (June 4, 1984). Ironically, until such time as the Supreme Court clarifies *Branti* and *Elrod,* the first amendment rights of alleged discriminatees will be more effectively protected in the Commonwealth's courts than in federal courts. In the meantime, because I consider that the majority errs in its interpretation of *Branti* and *Elrod,* I shall continue to dissent on this issue in those cases that are litigated in this forum.